United States District Court
Southern District of Texas
**ENTERED**
September 14, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARY M ZAPATA, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 1:16-CV-030 |
| | § | |
| HSBC HOLDINGS PLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINON AND ORDER

### I. Factual and Procedural Background

The Plaintiffs are allegedly victims and family members of the victims of five of Mexico's largest and most powerful drug cartels: the Sinaloa Cartel, the Juarez Cartel, the Gulf Cartel, Los Zetas Cartel, and the Norte del Valle Cartel (collectively referred to as drug trafficking organizations or "DTOs").

Mexican DTOs are highly organized and sophisticated criminal enterprises. The DTOs are responsible for the trafficking of humans and drugs, and for brutal criminal acts both in the United States and Mexico.[1] The DTOs' influence spans the United States, reaching from the state of Washington to New Hampshire.[2] The heroin, methamphetamine, and other drugs the DTOs traffic across the southwest border are distributed to citizens in the heartland of the United States for profit, regardless of human costs.[3] In part due to the effectiveness of their distribution system, drug overdose is now the leading cause of death for Americans under 50 years of age.[4]

---

[1] June S. Beittel, Cong. Research Serv., *Mexico: Organized Crime and Drug Trafficking Organizations* 3–4, 18 (2017), *available at* https://fas.org/sgp/crs/row/R41576.pdf (hereinafter "CRS Report").
[2] *See* U.S. Drug Enforcement Admin., *United States: Areas of Influence of Major Mexican Transnational Criminal Organizations* 2 (2015), *available at* https://www.dea.gov/docs/dir06515.pdf.
[3] *See id.*
[4] *See* U.S. Drug Enforcement Admin., *2016 National Drug Threat Assessment Summary*, at vi (2016), *available at* https://www.dea.gov/resource-center/2016%20NDTA%20Summary.pdf; Josh Katz, *Drug Deaths in America Are Rising Faster Than Ever*, N.Y. Times: TheUpshot (June 5, 2017),

The DTOs adapt to their end users, showing supply-side flexibility in response to changing addiction patterns. For example, the DTOs have more recently started to ship large quantities of fentanyl, a controlled substance which can be even more deadly than either methamphetamine or heroin.[5]

The DTOs employ terror and intimidation to achieve their goals. For example, the Zetas publicly display and/or post online gruesome pictures of dead bodies and body parts to frighten local citizens, Mexican law enforcement, journalists, and rival organizations.[6] The Zetas are linked to a number of massacres, including the torture and mass execution of nearly 200 migrants traveling in northern Mexico in 2011.[7] In addition to arming themselves with military-style assault weapons, the DTOs are known to utilize insurgent or terrorist techniques such as car bombs, grenades, and rocket-propelled-grenade launchers.[8] Acting Administrator of the Drug Enforcement Administration Chuck Rosenberg declared the Mexican DTOs to be "the most significant drug trafficking organizations operating in the United States today," describing them as "dangerous," "highly sophisticated," and warned that they are "increasingly a threat to the safety and security of our communities."[9]

Each of the Plaintiffs had family members who were allegedly killed or injured in Mexico or were themselves injured in Mexico as a result of cartel violence between 2008 and 2011. The Plaintiffs brought this civil suit under the Anti-Terrorism Act ("ATA") pursuant to 18

---

https://www.nytimes.com/interactive/2017/06/05/upshot/opioid-epidemic-drug-overdose-deaths-are-rising-faster-than-ever.html?mcubz=3.

[5] *See, e.g.*, Press Release, U.S. Attorney's Office, Hundreds of Counterfeit Oxycodone Tablets Seized at Port of Entry Contained Ultra-Deadly Fentanyl (Apr. 14, 2016), *available at* https://www.justice.gov/usao-sdca/pr/hundreds-counterfeit-oxycodone-tablets-seized-port-entry-contained-ultra-deadly.

[6] CRS Report at 2, 18.

[7] *Id.* at 18.

[8] *Id.* at 4; Christopher Ingraham, *Why Mexico's Drug Cartels Love America's Gun Laws*, Wash. Post: Wonkblog (Jan. 14, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/01/14/why-mexicos-drug-cartels-love-americas-gun-laws/?utm_term=.64faf6052cbb.

[9] U.S. Drug Enforcement Admin., *2015 National Drug Threat Assessment Summary*, at iii (2015), *available at* https://www.dea.gov/docs/2015%20NDTA%20Report.pdf.

U.S.C. §§ 2333(a), 2339A, and 2339C against four Defendants. Section 2333(a) of the ATA provides civil remedies to United States nationals and their estates, survivors, and heirs for injuries suffered "by reason of" an act of "international terrorism." *Id.* § 2333(a).

Section 2339A forbids anyone from providing material support or resources, or concealing or disguising the nature, location, source, or ownership of material support or resources, knowing or intending that the support or resources are to be used in preparation for, or in carrying out, a violation of a number of terrorism-related crimes. *Id.* § 2339A. Section 2339C forbids anyone from unlawfully and willfully providing or collecting funds, or attempting or conspiring to provide or collect funds, with the intent or knowledge that such funds be used, in full or in part, to carry out "any act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act." *Id.* § 2339C. Section 2339C further forbids anyone in the United States, or any United States national or United States entity operating outside the United States, from knowingly concealing or disguising the nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds, knowing or intending that such support, resources or funds will be used to carry out any terrorist act. *Id.*

The Plaintiffs have pleaded ATA claims against:

(1) Defendant HSBC Holdings plc ("HSBC Holdings"), the parent company of all HSBC-related entities. HSBC Holdings is incorporated in England and Wales and headquartered in London.

(2) Defendant HSBC U.S. Bank USA ("HSBC U.S."), a federally chartered banking institution headquartered in McLean, Virginia, with its principal office in New York City.

(3) Defendant Grupo Financiero HSBC, S.A. de C.V. ("HSBC Mexico Group") the indirect subsidiary of HSBC Holdings.

(4) Defendant HSBC Mexico S.A., Institución de Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico"), the principal operating company of Defendant HSBC Mexico Group.[10]

The Plaintiffs have pleaded, pursuant to section 2339A of the ATA, that Defendants provided material support to terrorists (the DTOs) by providing critical financial services and laundering their money, knowing that such support and resources would be used to violate predicate statutes under section 2339A including murder, kidnapping, and torturing United States citizens outside the United States. [*See* Pls.' First Amended Compl. ¶¶ 262–74].

Pursuant to section 2339C of the ATA, Plaintiffs have pleaded that Defendants unlawfully and willfully provided funds to, and collected funds from, the DTOs, knowing that the DTOs would use such funds, in full or in part, to carry out acts intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, and that the purpose of such acts, by their nature or context, would be to intimidate the Mexican and United States populations, or to compel the Mexican and United States governments to, among other things, abstain from interfering with their illicit and murderous enterprises. [*See id.* ¶¶ 276–77]. Further, Plaintiffs have pleaded that Defendants knowingly concealed or disguised the nature, location, source, ownership, or control

---

[10] This summary uses the Plaintiffs' own nomenclature.

of material support or resources, or funds or proceeds of such funds, knowing the fact that the DTOs would use the funds to carry out the same types of terrorist acts. [*See id.* ¶ 279].

The Defendants subsequently filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6) and a motion to transfer venue pursuant to 28 U.S.C. §§ 1404 and 1406. For purposes of the 12(b)(2) motion, the Defendants concede that this Court has personal jurisdiction over HSBC U.S. The Defendants deny, however, that this Court has personal jurisdiction over HSBC Mexico, HSBC Mexico Group, and HSBC Holdings. The Defendants acknowledge that the Southern District of New York has personal jurisdiction over HSBC U.S., HSBC Mexico, and HSBC Mexico Group, but deny that any United States District Court has jurisdiction over HSBC Holdings.

As Defendants concede that three of the four Defendants are subject to personal jurisdiction in New York, the Defendants ask this Court to transfer this case to the Southern District of New York. Alternatively, Defendants HSBC Holdings, HSBC Mexico, and HSBC Mexico Group ask the Court to dismiss the case for want of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). This order will address solely Defendants' argument that this Court does not have personal jurisdiction over Defendant HSBC Holdings.

## II. Legal Standard

The plaintiff has the burden to make a prima facie showing that personal jurisdiction is proper. *Luv N' Care, Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 469 (5th Cir. 2006). To establish that personal jurisdiction is proper, the plaintiff must show that the nonresident defendant "purposefully availed [itself] of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state." *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). "Sufficient minimum

5

contacts will give rise to either specific or general jurisdiction." *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002).

The "prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865 (5th Cir. 2001); *see also Seitz v. Envirotech Sys. Worldwide Inc.*, 513 F. Supp. 2d 855, 862 (S.D. Tex. 2007) (granting dismissal where "no supporting evidence was provided" to support conclusory allegations of minimum contacts with Texas). Factual conflicts in any affidavits presented by the parties must be resolved in the plaintiff's favor for determining whether a prima facie case for personal jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990).

### III. Analysis

**1. General Jurisdiction**

The Supreme Court most recently considered the requirements to establish general jurisdiction in *Daimler AG v. Bauman*, 134 S. Ct. 746, 750 (2014). The Court observed that the proper consideration when determining general jurisdiction is whether the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 761 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011)). The Court held that for a corporation, "the place of incorporation and principal place of business" are where it is "at home" and are thus paradigm bases for jurisdiction. *Id.* at 760. It is, therefore, difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business. *See id.*; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411–12, 418 (1984). The Plaintiffs have not pleaded

that Defendant HSBC Holdings is subject to general jurisdiction, in effect, conceding that as to this Defendant, it does not exist.

**2. Specific Jurisdiction**

    **a. Federal Long Arm Statute**

Fed. R. Civ. P. 4(k)(2) authorizes a federal court to exercise jurisdiction over a foreign defendant that has sufficient connections with the United States as a whole, but lacks the requisite connection to a particular state. *See Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646 (5th Cir. 2004). Jurisdiction pursuant to Rule 4(k)(2) is proper where: (1) the claims against the defendant arise under federal law, (2) the defendant "does not concede to jurisdiction in another state," and (3) "the defendant has sufficient ties to the United States as a whole to satisfy due process concerns." *Id.* at 651. Under Rule 4(k)(2), minimum contacts are measured with reference to the Fifth Amendment rather than the Fourteenth. *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 420 (5th Cir. 2001). The Court must look to the sufficiency of a party's ties with the United States as a whole rather than any specific state. *Id.*

The Plaintiffs allege the following contacts which they claim give this Court jurisdiction over HSBC Holdings pursuant to Rule 4(k)(2): (1) HSBC Holdings set high-level money-laundering protocol, (2) HSBC Holdings actively managed HSBC Mexico and HSBC U.S., (3) HSBC Holdings' personnel actively managed the anti-money laundering (AML) efforts at HSBC Mexico and were fully aware of the AML deficiencies at HSBC Mexico spanning nearly a decade, (4) HSBC Holdings' compliance officials exercised systemic inaction which amounted to willful blindness towards illicit proceeds moving from HSBC Mexico to HSBC U.S., and ultimately to bank accounts in Texas, and (5) HSBC Holdings intentionally failed to alert HSBC

U.S. about the money-laundering risks plaguing HSBC Mexico. [*See* Pl.'s First Amended Compl. ¶¶ 149–52].

Distilled, the Plaintiffs have alleged that HSBC Holdings (1) failed to act on the money-laundering control issues plaguing its subsidiaries and (2) failed to warn its subsidiaries about money-laundering risks and failed to exercise the control it has over its subsidiaries to stop the money laundering. The Defendants respond that Plaintiffs have not alleged "purposeful" contacts, but rather have pleaded solely inaction—which is insufficient "contact" to justify the assumption of jurisdiction.

The Plaintiffs argue that here, as in *Mullins v. TestAmerica, Inc.*, HSBC Holdings is far from a passive party who sat back and merely watched the criminal activity of its subsidiaries. 564 F.3d 386 (5th Cir. 2009). *Mullins*, however, is inapplicable. In *Mullins*, the Fifth Circuit held that where an out-of-forum defendant knowingly received an allegedly fraudulent transfer which occurred outside the forum but had foreseeable consequences to an aggrieved creditor in the forum, jurisdiction was appropriate. 564 F.3d at 401–403. In contrast to the contacts pleaded by Plaintiffs as to HSBC Holdings, the defendant in *Mullins* was significantly more involved than HSBC Holdings in the acts which gave rise to the Plaintiffs' cause of action. Notably, the defendant in *Mullins* engineered the exact transaction at issue in the fraudulent transfer claim. *Id.* at 386. This is a far step removed from the high-level policy-setting role and systemic inaction Plaintiffs attribute to HSBC Holdings. The Plaintiffs have not pleaded purposeful contacts aimed at the forum to establish the prima facie case for jurisdiction through Rule 4(k)(2).

While the alleged conduct, if true, is reprehensible, the Court must agree with HSBC Holdings' position. *See Chlebda v. H.E. Fortna & Bro., Inc.*, 609 F.2d 1022, 1023–24 (1st Cir.

1979) (clarifying that an omission or a failure to act may not qualify as a minimum contact needed to confer jurisdiction); *Filus v. LOT Polish Airlines*, 907 F.2d 1328, 1333 (2d. Cir. 1990) (holding that a failure to warn does not constitute an "act performed in the United States in connection with a commercial activity of the foreign state elsewhere" under Foreign Sovereign Immunities Act) (internal citation omitted).

### b. Imputation of Contacts

The Plaintiffs further allege that, since HSBC Holdings is the parent company of HSBC Mexico and HSBC U.S., the contacts of HSBC Mexico and HSBC U.S. should necessarily be imputed to HSBC Holdings.[11] The Court begins with the "presumption that that a subsidiary, even a wholly-owned subsidiary, is independent of its parent company for jurisdictional purposes." *Administrators of Tulane Educ. Fund v. Ipsen*, S.A., 450 Fed. Appx. 326, 329 (5th Cir. 2011). Imputation of contacts is permissible only if Plaintiffs overcome the presumption with "clear evidence." *Id.*

To attribute activities of a subsidiary to a parent, an alter ego relationship between the subsidiary and the parent must be established. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000). A high degree "of control by the parent over the internal business operations and affairs of the subsidiary" is needed to "fuse the two for jurisdictional purposes." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). The relevant factors are: (1) the amount of stock owned by the parent; (2) whether the two corporations have separate headquarters; (3) whether the corporations have common officers and directors; (4) whether the corporations observe corporate formalities; (5) whether the corporations maintain separate accounting systems; (6) whether the parent exercises complete authority over general policy; and

---

[11] The Plaintiffs have not pleaded any Texas-related contacts for Defendant HSBC Holdings. Therefore, it is unnecessary to analyze Defendant HSBC Holdings' contacts under the Texas long-arm statute.

(7) whether the subsidiary exercises complete authority over daily operations. *Id.* No one factor is determinative; the court must consider the totality of the circumstances. *Sapic v. Gov't of Turkm.*, 345 F.3d 347, 359 (5th Cir. 2003*); see also Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338–39 (5th Cir. 1999) (affirming dismissal for lack of personal jurisdiction, holding the *Hargrave* factors applicable in "deciding whether a parent company can be held amenable to personal jurisdiction because of the acts of a subsidiary").

In *Administrators of the Tulane Educational Fund v. Ipsen, S.A.*, the Fifth Circuit addressed the possibility of imputation of a subsidiary's contacts to a parent company that indirectly owned all of the subsidiary's stock, had a substantial number of common officers and directors with the subsidiary, and exercised substantial control over the subsidiary's general policy decisions. 450 Fed. Appx. 326, 330 (5th Cir. 2011). Nevertheless, the court held that the contacts of the subsidiary could not be imputed to the parent company. *Id.* at 331–32. Notably, the Fifth Circuit focused on a lack of evidence regarding the parent company's control over the subsidiary's day-to-day operations. The court ruled that general policymaking oversight pleaded by the plaintiffs (similar to the pleadings herein) was behavior wholly consistent with the parent company's inherent role in the parent–subsidiary relationship. *Id.* at 332.

The Defendants' Fed. R. Civ. P. 7.1 corporate disclosure statement indicates that HSBC Holdings indirectly owns nearly all (99.9%) of HSBC Mexico's capital stock. [Doc. No. 49]. Similarly, HSBC U.S., which is not a publicly held company, is indirectly owned by HSBC Holdings. [Doc. No. 48]. Nevertheless, there is no allegation (and certainly no proof) that HSBC Holdings exerted a level of control sufficient to impute its subsidiaries' contacts to HSBC Holdings for jurisdictional purposes. HSBC Holdings did not control the day-to-day operations for HSBC U.S., HSBC Mexico, or HSBC Mexico Group. Instead, like the parent company in

*Ipsen*, which indirectly owned all of its subsidiary's stock, HSBC Holdings exerted only general policymaking oversight over its subsidiaries. Furthermore, there is no allegation (or proof) of shared directors, officers, or accounting systems between HSBC Holdings and its indirect subsidiaries. Even assuming HSBC Holdings' indirect subsidiaries had sufficient contacts to warrant this Court's jurisdiction over those Defendants, the Plaintiffs have not overcome the presumption of corporate independence and thus cannot impute the subsidiaries' contacts to HSBC Holdings. Therefore, this Court may not assume personal jurisdiction over HSBC Holdings.

## IV. Conclusion

For the above-mentioned reasons, this Court may not exert personal jurisdiction over Defendant HSBC Holdings. Defendant HSBC Holdings' Motion to Dismiss is granted. [Doc. No. 45]. Pursuant to Fed. R. Civ. P. 12(b)(2), Defendant HSBC Holdings is hereby dismissed from this case.

Signed this 14th day of September, 2017.

                                            Andrew S. Hanen
                                            United States District Judge